UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

OMEGA APPAREL INCORPORATED, )
                             )
        Plaintiff,            )
                             )
    v.                        )     No. 2:11-0031
                             )     Judge Sharp
ABF FREIGHT SYSTEM, INC.,    )
                             )
        Defendant.            )

## MEMORANDUM

This is an action under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11706, seeking to recover damages for shipped goods ruined during the May 2010 floods in Nashville, Tennessee. Defendant ABF Freight System, Inc. ("ABF") has filed a Motion for Summary Judgment (Docket No. 29), to which Plaintiff Omega Apparel Incorporated ("Omega") has filed a response in opposition (Docket No. 32), and ABF has replied (Docket No. 36). For the following reasons, the motion will be denied.

## I. FACTUAL SUMMARY

To place the parties' arguments in context, the facts underlying this case need only be recounted briefly. Construed in Omega's favor, those facts are as follows:

Pursuant to a Straight Bill of Lading, ABF agreed to deliver a shipment consisting of 15,478 yards of Cloth Wool, Serge, Army Green fabric to Omega. The fabric was on 167 rolls, with a total value in excess of $200,000.

On April 28, 2010, the fabric, which had been staged at a facility in Lansing, Michigan, was loaded into an ABF trailer. At the time ABF took possession of the fabric, it was in good condition.

1

The trailer containing the fabric arrived at ABF's Nashville facility on April 29, 2010. On the evening of May 2, 2010, ABF's property flooded after several days of persistent rain. As a result, the trailer containing the fabric became partially submerged. The fabric was inundated by floodwater, and was ruined.

ABF's truck terminal facility in Nashville is located on property just east of Browns Creek, and 30 to 40 feet from the banks of the Cumberland River. The property lies within a 100-year floodplain, portions of which are designated as a floodway.

The facility includes a loading dock with 88 bays that have no doors. It also includes an outbound lot which is located across Browns Creek and accessible by a bridge. The outbound lot is used for "passover loads," that is, loads that do not terminate in Nashville, but are en route to another destination.

Nicholas Ricke ("Ricke") is the manager of ABF's Nashville facility. He is responsible for implementing policies at the terminal, and overseeing its operations. The day before the flood, Ricke watched television reports regarding the rain in and around Nashville, and saw a newscast which showed a building floating down Interstate 24. This caused him some concern, although, at the time, forecasters were not calling for flooding of the Cumberland River.

The following morning, Ricke and his son went to church in Williamson County.[1] After reading the paper, and "talking to people and realizing how much rain Davidson County was getting all Saturday night and all Sunday morning, [Ricke] decided to drive into the terminal to check on it . . . for peace of mind." (Docket No. 33-1, Ricke Stmt at 3).[2] Ricke and his son arrived at the

---

[1] Nashville is located in Davidson County, just north of Williamson County.

[2] Even prior to attending church, Ricke heard or saw "a lot of flash floods reports for the creeks in the outlining [sic] areas, but no reference about the Cumberland River." (Id.).

terminal around 11:30 a.m.

Upon arrival, Ricke noticed that Browns Creek was "as high as [he'd] ever seen it," during the six years he had worked at the Nashville ABF terminal. The water in Browns Creek was approximately 8 feet below the bridge used to access the outbound lot, and the Cumberland River was 8 to 10 feet below its banks. (Docket No. 29-1, Ricke Depo. at 62-63; Docket No. 33-1, Ricke Stmt. at 3).

At the time, there were approximately 40-50 passover trailers in the outbound lot. Another 60-100 trailers were located elsewhere at the facility.

Concerned that Browns Creek might top its banks and/or make it impossible or unsafe to cross the bridge, Ricke asked two drivers that were already at the facility[3] to pull the trailers located in the outbound lot across the bridge. By approximately 1:00 p.m., all of the 40-50 passover trailers had been moved across the bridge from the outbound lot to an employee parking lot located in front of the facility. This was the first and only time that trailers were parked in the employee's parking lot.

Once the trailers had been moved, the drivers left. Ricke, too, decided to leave the facility. Prior to doing so, however, Ricke told a security guard that he was going home to change clothes, but that he would return if needed. Ricke told the security guard to call him "if we have any water reaching the property." (Docket No. 33-1 at 5).

After arriving at his residence, Ricke was called by the security guard who told him that there were "problems" and that "the water [wa]s coming through the manhole sewer covers." (Id.). The

---

[3] One of the drivers was there to take a load to Atlanta. The other driver had arrived with a load, and was waiting for a van to take her to the motel so she could rest.

3

security guard also told him that "he was moving his vehicle off the property and was going to sit across the street and watch everything." (Id.). Ricke called his boss and told him that they had "some water problems." (Id. at 6).

The security guard called Ricke a second time at around 2:30 to 3:00 p.m., and Ricke decided at that point to return to the facility. What was usually a 30 minute drive turned into a 90 minute drive because, by then, portions of the Interstates were closed. While his son drove, Ricke called drivers in an effort to have them come in and move trailers. Of the twenty city drivers in the Nashville area, only six drivers were able to make it to the facility.

Ricke arrived at the facility around 4:00 p.m. and found "at least three feet of standing water in the yard." (Id. at 8). Adjacent trucking companies were also trying to save equipment, and Metro was trying to move city buses to safety, rendering the access streets congested.

Ricke and the drivers that made it in began to move trailers and did so until 5:30 or 6:30 p.m. when the water got too deep. It is unclear from the record how many trailers were saved, but ABF states in its Memorandum that there were "very few trailers remaining on the property" when the facility flooded. (Docket No. 31 at 7).

Unfortunately for Omega, the trailer containing its fabric was not saved, and Omega filed a three-count Complaint in this Court alleging breach of contract, negligence, and liability under the Carmack Amendment. By Order dated June 21, 2011 (Docket No. 17), the Court dismissed the breach of contract and negligence claims because both were preempted by the Carmack Amendment. That remaining claim is now the subject of ABF's Motion for Summary Judgment.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are no genuine issues

4

of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. LEGAL DISCUSSION

So far as relevant, the Carmack Amendment provides:

> A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 [49 U.S.C. § 13501] shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service . . . are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States . . .

49 U.S.C. § 14706(a)(a). "Carmack's purpose is to relieve cargo owners 'of the burden of searching out a particular negligent carrier from among the often numerous carriers handling interstate shipment of goods.'" Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 130 S.Ct. 2433, 2441 (2010) (quoting, Reider v. Thompson, 339 U.S. 113, 119 (1950)). The Amendment "imposes something close to strict liability" on carriers of interstate goods. Ranking v. Allstate Ins. Co., 335 F.3d 8, 9 (1st Cir. 2003), accord, Mitsui Sumitomo Ins. Co., Ltd. v. Evergreen Marine Corp., 621 F.3d 214, 216 (2nd Cir. 2010).

To recover under the Carmack Amendment, "a shipper must establish a *prima facie* case of negligence by demonstrating: (1) delivery of the goods in good condition; (2) receipt by the

5

consignee of less goods or damaged goods; and (3) the amount of damages." Man Roland, Inc. v. Kreitz Motor Exp., Inc., 438 F.3d 476, 479 (5th Cir. 2006) (footnote omitted). "In fact, the carrier's delivery of damaged goods which were in good condition when it received them create[s] a presumption of negligence, not a mere inference." Plough, Inc. v. Mason & Dixon Lines, 630 F.2d 468, 471 (6th Cir. 1980).[4] If a shipper establishes a *prima facie* case, the carrier can overcome the presumption of negligence "by showing that it was free from negligence and that the damage was due to the inherent nature of the goods or attributable to an act of God, public enemy, the shipper, or public authority." Man Roland, 438 F.3d at 479; see also, A.I.G. Urugagua Compania de Serguros, S.A. v. AAA Cooper Trans., 334 F.3d 997, 1003 (11th Cir. 2003); Am. Nat. Fire Ins. Co. v. Yellow Freight Sys., Inc., 325 F.3d 924, 929 (7th Cir. 2003); Paper Magic Group v. J.B. Hunt Trans., Inc., 318 F.3d 458, 361 (3rd Cir. 2003).

ABF does not argue that Omega cannot establish a *prima facie* case. Rather, it argues that the fabric was lost due to action by a public authority,[5] or an act of God, either of which can serve as a defense to a claim under the Carmack Amendment.

"Although cases raising the public authority defense are antiquated, the facts typically include active intervention by a public authority and a situation beyond the knowledge or control of the carrier." Delta Research Corp. v. EMS, Inc., 2005 WL 1981775 at *3 (E.D. Mich. Aug. 16, 2005), citing, Chicago & E.I.R. Co. v. Collins Produce Co., 249 U.S. 186 (1919) (involving seizure

---

[4] "The burden which shifts to the carrier once a shipper makes out a *prima facie* case is not the burden of going forward with the evidence," but rather, "[i]t is the burden of proof which 'shifts to the carrier and remains there.'" Id. (citation omitted).

[5] In its response brief, Omega argues that ABF has waived the public authority defense because it was not raised in the Answer. However, since Omega's filing, the Magistrate Judge has granted ABF leave to amend its Answer to include the public authority affirmative defense. (Docket No. 34).

6

of poultry shipment by military authorities under martial law); Boyd v. King, 167 N.W. 901 (Mich. 1918) (involving the government's quarantine of livestock). That is, a carrier is generally entitled to the public authority defense under the Carmack Amendment in situations "involving active intervention in or prevention of delivery by the government, such as embargos, loss of cargo through the legal process and declaration of martial law," but not simply because of "the malfeasance or nonfeasence of the governmental agency[.]" Id.

ABF relies upon an "After Action Report" prepared by the Army Corp of Engineers ("Corp") as the primary basis for its public authority defense. It argues: (1) the Corps failed to communicate the releases of water through the Cumberland River Basin to the National Weather Service ("NWS"), and, at one point, received only information about the expected rainfall from the media; (2) the NWS misjudged the impending rainfall by over one hundred percent, and severely misjudged the location of the storm center; (3) the NWS' failure to accurately predict the intensity and location of the storm led the Corps to make only minimal adjustments in lake levels before the flood; and (4) once the full magnitude of the event was realized, the reservoirs had no capacity and required that water be discharged to prevent failure of the dams and levees, which, in turn, led to extensive flooding.

As a recent spate of filings in this Court shows, the jury is still out on the issue of whether the Corp or the NWS bears some responsibility for the extent of the damage caused by the May 2010 flood. See, A.O. Smith et al. v. United States, No. 3:12-00429, Docket No. 1 ((M.D. Tenn. April 30, 2012) (complaint by Gaylord Entertainment and Opryland Hotels, among others, alleging negligence by the Corp and the NWS in relation to the May 2010 flood); Royal and Sun Alliance, PLC v. United States, No. 3:12-00426, Docket No. 1 (M.D. Tenn. April 30, 2012) (suit by British

7

insurer for losses and damages to its insured due to alleged negligence of the Corp and the NWS in relation to the flood); Continental Insur. Co. *et al*. v. United States, 3:12-00433, Docket No. 1 (M.D. Tenn. April 30, 2012) (same allegations brought by insurers for Nissan America and Gibson Guitar). Although ABF has presented evidence from which a jury *might* be able to place some blame on the Corp or the NWS, that evidence hardly establishes, as a matter of law, ABF's own negligence did not play some role in the loss. See, Plough, 630 F.2d at 470-71 ("In order to avoid liability the carrier must . . . prove two things: that it was not negligent and that the sole cause of the injury was one of the five exceptions" for liability).

As for the act of God defense, and, notwithstanding Omega's reliance on cases which indicate that "[w]hether a particular flood is of such extraordinary and unprecedented nature as to constitute an 'act of God' is a question of fact for the jury," Lee v. Mobil Oil Corp., 452 P.2d 857, 861 (Kan. 1969), any reasonable jury would be hard-pressed to find that the May 2010 Nashville flood was anything but extraordinary and unprecedented:

> The May 2010 Tennessee floods were 1000–year floods in Middle Tennessee, West Tennessee, South Central and Western Kentucky and Northern Mississippi as the result of torrential rains on May 1 and 2, 2010. At least 30 counties in Tennessee were declared major disaster areas by the federal government, with 52 applying to receive this status. This translates to about 31% of Tennessee being designated a major disaster area.
>
> According to Nashville Mayor Karl Dean, damage estimates in Nashville totaled $1.5 billion not including damage to roads and bridges or public buildings, as well as contents inside buildings and residences. . . .

In re Pigg, 453 B.R. 728, 733 n.10 (Bkrtcy. M.D. Tenn. 2011); Airpro Sys., Inc. v. Prologis North Carolina Ltd., 2012 WL 2357443 at *1 (M.D. Tenn. June 20, 2012) ("In late April and early May 2010, after days of steady rain Nashville suffered severe flooding"); Wendy's of Bowling Green, Inc. v. March USA, Inc., 2012 WL 370486 at *1 (M.D. Tenn. Feb. 3, 2012) ("This dispute arises

8

from the record floods in Middle Tennessee in May of 2010").

Even so, and as already indicated, ABF is not absolved of liability unless it can show that its negligence played no role in the loss. See, Missouri P.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137–38 (1964) (emphasis added) ("the burden of proof is upon the carrier to show *both* that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability"); REI Transport, Inc. v. C.H. Robinson Worldwide, Inc., 519 F.3d 693, 699 (7th Cir. 2008); (once *prima facie* case is made, burden is on carrier to prove that it was free from negligence, and that the damage to the cargo was caused by one of the five excusable factors); A.I.G. Urugagua, 334 F.3d at 1003 (same).

Negligence is "basically defined as the failure to exercise reasonable care," Griggers v. Memphis Hous. Auth., 277 S.W.3d 359, 364 (Tenn. 2009), with "reasonable care" defined as "the care an ordinarily prudent person would take under the circumstances." Snider v. Snider, 855 S.W.2d 588, 590 (Tenn. Ct.App. 1993). "'Ordinary, or reasonable, care is to be estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury.'" Marla H. v. Knox County, 361 S.W.3d 518, 537 (Tenn. Ct.App. 2011) (citation omitted). "In other terms, a defendant must take reasonable care in light of the apparent risks." Id. (citation omitted).

On no less than five occasions in the brief in support of its Motion for Summary Judgment, ABF characterizes Ricke's actions as "heroic," and in its response brief characterizes him as acting "valiantly." However, "summary judgment is generally inappropriate in negligence cases," Moore v. Butler, 2011 WL 6004010 at *5 (Tenn. Ct. App. 2011), and "[w]hat a reasonably prudent person would or should have done under a given set of circumstances is generally a jury question." Mullins

9

v. Precision Rubber Products Corp., 671 S.W.2d 496, 500 (Tenn. Ct. App. 1984). "'It is only when the evidence is free from conflict and the inference from that evidence is so certain that all reasonable men in the exercise of free and impartial judgment, must agree upon it, that a Court may direct a verdict.'" Id. at 500-01 (citation omitted).

In this case, and based on Ricke's own testimony, Omega has set forth a list of facts and inferences from which a reasonable jury could conclude that ABF did not exercise reasonable care under the circumstances, and that failure led to the unnecessary loss of the fabric:

> 1. The two drivers that were at the Facility on the morning of May 2, 2010, could have begun moving trailers to safety as early as 11:30 a.m. on May 2, 2010, if not earlier;
>
> 2. Had Mr. Ricke called drivers in earlier in the day on May 2, 2010, more drivers would have been able to arrive at the Facility and assist in moving trailers to safety;
>
> 3. Had more drivers been able to make it to the Facility, more trailers could have been moved to safety, because there were 20 trucks available to move trailers at the Facility on May 2, 2010;
>
> 4. Had Mr. Ricke stayed at the Facility all day on May 2, 2010, he personally could have been moving trailers to safety for a substantial time prior to when he arrived back at the Facility Sunday evening at 4:00 p.m.;
>
> 5. Had Mr. Ricke stayed at the Facility all day long on May 2, 2010, he could have better coordinated the evacuation of the Facility and would not have been delayed returning to the Facility from his home;
>
> 6. Had the evacuation of trailers from the Facility been initiated earlier than 4:00 p.m., more trailers would have been moved to safety, because the evacuation would have begun before three feet of water was standing in the yard at the Facility;
>
> 7. Had the evacuation of trailers from the Facility been initiated earlier than 4:00 p.m., more trailers would have been moved to safety, because, by the time Mr. Ricke returned to the Facility at 4:00 p.m., traffic on the roadways leading to the Facility was chaotic and congested;
>
> 8. Had Mr. Ricke not left the Facility and not merely relied on an elderly security guard who was not employed by Defendant and whose name Mr. Ricke did not even

10

know, Mr. Ricke would have observed actual flooding at the Facility earlier in the day on May 2, 2010, and could have begun evacuating the Facility prior to 4:00 p.m. on Sunday, May 2, 2010;

9. Had Mr. Ricke not ignored the first phone call he received from the security guard on the afternoon of May 2, 2010, he could have initiated the evacuation of the Facility earlier in the day on May 2, 2010; and

10. Had appropriate policies and procedures been created and implemented which guided the employees working at the Facility in how to respond to a natural disaster, like a flood, the evacuation of the Facility would have been more efficient, more organized, and more effective, and additional trailers would have been moved to safety on May 2, 2010.

(Docket No. 32 at 32-34).

From the foregoing, a jury could determine that AFB did not act in a reasonable, timely, or prudent manner to safeguard and protect the shipments, including the fabric, at ABF's facilty. Of course, that same jury could reach the opposite conclusion.

## IV.  **CONCLUSION**

On the basis of the foregoing, ABF's Motion for Summary Judgment (Docket No. 29) will be denied.

An appropriate Order will be entered.

*Kevin H. Sharp*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

11